STATE OF CONNECTICUT *v.* PERCY MEJIA
(15103)

CALLAHAN, BORDEN, NORCOTT, KATZ and PALMER, Js.

216

Argued March 23—decision released May 23, 1995

*Neal Cone*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, was *James E. Thomas*, state's attorney, for the appellee (state).

KATZ, J. The defendant, Percy Mejia, was convicted after a jury trial of murder in violation of General Statutes § 53a-54a,[1] unlawful possession of a weapon in a

---

[1] General Statutes § 53a-54a provides: "MURDER. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the

motor vehicle in violation of General Statutes § 29-38,[2] carrying a pistol without a permit in violation of General Statutes § 29-35,[3] and unlawful possession of a

defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony or murder under section 53a-54d."

[2] General Statutes § 29-38 provides: "WEAPONS IN VEHICLES. Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. The word 'weapon,' as used in this section, means any pistol or revolver, any dirk knife or switch knife or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, and any other dangerous or deadly weapon or instrument, including any slung shot, black jack, sand bag, metal or brass knuckles, stiletto, knife, the edged portion of the blade of which is four inches or over in length or martial arts weapon as defined in section 53a-3. The provisions of this section shall not apply to any person enrolled in and currently attending a martial arts school, with official verification of such enrolment and attendance, having any such martial arts weapon in a vehicle while traveling to and from such school."

[3] General Statutes § 29-35 provides: "CARRYING OF PISTOL OR REVOLVER WITHOUT PERMIT PROHIBITED. EXCEPTIONS. (a) No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or

sawed-off shotgun in violation of General Statutes
§ 53a-211.[4] The trial court imposed a total effective sen-
tence of forty-five years incarceration.[5] The defendant
claims on appeal that: (1) by informing him, only after
voir dire had concluded, that the jury would be permit-
ted to take notes during his trial, the trial court improp-
erly infringed on his right to voir dire, thereby violating
his rights under the United States and Connecticut con-

when going to or from any place of assembly, or to the transportation of
pistols or revolvers as merchandise, or to any person carrying any pistol
or revolver while contained in the package in which it was originally wrapped
at the time of sale and while carrying the same from the place of sale to
the purchaser's residence or place of business, or to any person removing
his household goods or effects from one place to another, or to any person
while carrying any such pistol or revolver from his place of residence or
business to a place or person where or by whom such pistol or revolver
is to be repaired or while returning to his place of residence or business
after the same has been repaired, or to any person carrying a pistol or
revolver in or through the state for the purpose of taking part in competi-
tions or attending any meeting or exhibition of an organized collectors' group
if such person is a bona fide resident of the United States having a permit
or license to carry any firearm issued by the authority of any other state
or subdivision of the United States, or to any person carrying a pistol or
revolver to and from a testing range at the request of the issuing author-
ity, or to any person carrying an antique pistol or revolver, as defined in
section 29-33.

"(b) The holder of a permit issued pursuant to section 29-28 shall carry
such permit on his person while carrying such pistol or revolver."

[4] General Statutes § 53a-211 provides: "POSSESSION OF A SAWED-OFF
SHOTGUN OR SILENCER: CLASS D FELONY. (a) A person is guilty of posses-
sion of a sawed-off shotgun or a silencer when he owns, controls or pos-
sesses any sawed-off shotgun that has a barrel of less than eighteen inches
or an overall length of less than twenty-six inches or when he owns, con-
trols or possesses any silencer designed to muffle the noise of a firearm
during discharge.

"(b) The provisions of this section shall not apply to persons, firms, cor-
porations or museums licensed or otherwise permitted by federal or state
law to possess, control or own sawed-off shotguns or silencers.

"(c) Possession of a sawed-off shotgun or a silencer is a class D felony."

[5] The trial court sentenced the defendant to forty-five years incarcera-
tion on the murder conviction, and five years incarceration each on the other
three convictions, those sentences to run concurrently with each other and
the forty-five year sentence, for a total effective sentence of forty-five years.

stitutions;[6] (2) the trial court abused its discretion in permitting the jurors to take notes in his case; (3) his conviction for murder was based on insufficient evidence, or was against the weight of the evidence; and (4) the trial court improperly instructed the jury on the jurors' duties, which caused the defendant unfair prejudice. We affirm.

The jury reasonably could have found the following facts. As of March 11, 1991, the defendant, Fermon Roy Smith and Kurt Krowson were employed by Wolf Trucking, Inc., a long haul trucking company located in Los Angeles, California. On that day, Krowson and Smith drove their tractor trailer containing lettuce to a motel in Windsor Locks. Smith was the "first seat," the employee with primary responsibility for the truck and its load, and Krowson was "second seat." They planned to spend the night at the motel before delivering their load in the morning to a warehouse in Windsor Locks. Later that evening, after the two men had dinner consisting of pizza and beer, Krowson went to sleep and Smith went to a local bar.

Early the next day, Krowson awoke to find Smith looking "hung over," smelling of alcohol and in no condition to help unload the trailer at the warehouse. Krowson then went to the warehouse alone, and began to unload the trailer at approximately 6:15 a.m. After unloading the trailer for a period of time, Krowson was approached by the defendant, who also had driven a

---

[6] The defendant claims that his inability to conduct voir dire on the subject of juror note-taking infringed his right: (1) to the effective assistance of counsel under the sixth and fourteenth amendments to the United States constitution and the constitution of Connecticut, article first, § 8; (2) to the effective assistance of counsel for the indigent accused as provided for in General Statutes § 51-296; (3) to question each juror individually under the constitution of Connecticut, amendment four; (4) to due process under the fourteenth amendment to the United States constitution and the constitution of Connecticut, article first, § 8; and (5) to question each juror individually in a criminal case as provided for in General Statutes § 54-82f.

company truck to the warehouse. The defendant, who knew that Smith was the "first seat," asked Krowson why Smith was not at the warehouse to help Krowson with the unloading of their trailer. Krowson told the defendant that Smith was back at the motel with a hangover. The defendant told Krowson that he was going to call Smith and "tell him to get over here," but, after Krowson asked him not to make the call, the defendant assured Krowson that he would not call Smith. The defendant told Krowson that he would receive payment for the entire unloading.

At approximately 7:30 a.m., Smith arrived at the warehouse and asked Krowson who had called him. Krowson told Smith that, because he had told only the defendant about Smith's whereabouts, it must have been the defendant who had placed the call. Krowson and Smith then began to unload the trailer together. After unloading the trailer for a period of time, the two men decided to get some coffee. On their way to get coffee, Krowson spotted the defendant and pointed him out to Smith.

The defendant and Smith approached each other and began to argue boisterously.[7] Although the argument was heated, the defendant and Smith did not threaten

---

[7] Krowson testified that "they were pretty close together. They were a foot—maybe less, or maybe a little bit more, apart from each other. . . . Facing one another, and then arguing and they were cussing. And they wanted to know—well, Percy—Roy [Smith] says, 'are you Percy?' Percy, goes, 'yeah, are you Roy?' And he says, 'yes.' And then a—they started arguing about 'who the hell are you to tell me how to run my fucking truck. You run your fucking truck the way that you want, and I'll run my fucking truck the way that I want to. . . .' [I]t was Fermon Roy Smith saying that at that point.

\* \* \*

"Yeah, they were both using profanity back and forth at each other, and I thought, that they were going to get into a fight. That's what I thought was going to happen, and I kept telling them that it's not worth getting into a fight over first seat, this is—this is stupid; and they just kept arguing back and forth with each other."

each other. Eventually, Smith, who did not wish to argue further, waved his hand at the defendant in an inoffensive manner as he turned away. As Smith walked away, the defendant withdrew a pistol from his pocket, raised it to eye level, paused to aim it, and then fired a single bullet into Smith's back.[8] The defendant was approximately twelve feet away from Smith when he fired the shot.[9]

Immediately after the defendant fired the shot, Smith turned around and started walking on his own. Soon thereafter, however, Smith told Krowson that he had

---

[8] Krowson testified that Smith had "turned completely around and he had his back to Percy and was walking the other way. . . . [A]fter he waved Mr. Mejia off and was walking back towards the truck, Mr. Mejia said, 'Oh, yeah, you think I'm kidding. You think I'm kidding,' and came up with a derringer [pistol] and shot him. Shot him right in the back." The defendant had "brought it up quick" with his arm fully outstretched and the gun level with his face. Further, "[i]t looked like he aimed it because he paused for a second—a split second there. He paused from the time that he brought it up until the time that he pulled the trigger."

[9] In his statement to the police, the defendant claimed that Smith "kept saying that if I didn't stay out of his business, he was going to kick my ass. I told him, come on do it. [Smith] started to come at me, and when he got to about four feet away from me I pulled out my derringer. . . . When [Smith] saw the gun, he turned around and started to run, and I fired one shot. I did not fire the second shot in the gun."

Edward McPhillips, a firearms examiner with the Connecticut state police, examined the handgun recovered from the defendant and testified at trial as to its use and characteristics. This particular model was a .38 caliber derringer pistol with two separate barrels, one on top of the other (also known as an "over and under" model). It utilizes a single action firing mechanism, which means that the user must manually pull back, or "cock," the hammer prior to each shot.

The defendant's particular handgun required eighteen pounds of force on the trigger to fire, which, in McPhillips' opinion, was much greater than the one to twelve pounds of force typically needed to fire many other types of handguns. On the basis of his examination and actual firing of the defendant's gun, McPhillips testified that only the bottom barrel was capable of firing a shot and that the casing found in the bottom barrel had been fired in the gun.

been shot and then collapsed.[10] Krowson attended to Smith and asked others to call for help. Smith died from a bullet that had entered his body slightly to the left of his back midline and exited from the left front side of his chest, leaving a bleeding hole in his left lung.

After the defendant shot Smith, he went to his tractor parked at the warehouse and "took off" with his codriver, Marco Romo. Because he did not have a pass authorizing his departure from the warehouse, the security personnel at the truck gate refused to permit the defendant to exit. In response, the defendant quickly reversed out of the outbound lane at the gate and exited through the inbound lane.[11]

After receiving notification of the shooting and a description of the defendant's tractor, Sergeant Roger Tharaldson of the Windsor Locks police department soon located the defendant and pulled his vehicle over. Tharaldson ordered the defendant to exit the vehicle, patted him down for weapons and then placed him in the police cruiser. Thereafter, accompanied by another officer, Tharaldson entered the "sleeper" portion of the defendant's tractor and found the derringer on top of a mattress there. The officers also found a sawed-off shotgun beneath the defendant's mattress.[12] Additional facts will be provided as necessary.

I

We first address the defendant's claim that there was insufficient evidence to support his conviction of mur-

---

[10] Because of Smith's reaction, Krowson initially believed that Smith had not been hit by the bullet, but that the defendant had merely "shot to scare him."

[11] The "truck gate" was not an actual barrier, but "a shack with openings on each side." The defendant could not exit through the outbound lane, however, because there was another truck in front of his tractor.

[12] The shotgun was measured as having a barrel of eleven and three-sixteenth inches, below the legal minimum of eighteen inches. See footnote 4.

der or, in the alternative, that the conviction of murder was against the weight of the evidence. Conceding that there was sufficient evidence to support a conviction of first degree manslaughter based on intent to inflict serious physical injury or extreme indifference to human life; General Statutes § 53a-55 (a) (1) and (3); the defendant argues only that there was insufficient evidence of intent to kill to support his murder conviction. We disagree.[13]

"In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *Greenfield,* 228 Conn. 62, 76, 634 A.2d 879 (1993). The specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11). . . . *State* v. *Raguseo,* 225 Conn. 114, 120, 622 A.2d 519 (1993). Intent is generally proven by circumstantial evidence because direct evidence of the accused's state of mind is rarely available. *State* v. *Greenfield,* supra, 77. Therefore, intent is often inferred from conduct; id., 76; and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. *State* v. *Raguseo,* supra, 119. This does not require that

---

[13] We need address only the defendant's claim that there was insufficient evidence to support his conviction. This is a constitutional claim and, therefore, is reviewable despite the defendant's failure to raise this claim at trial. *State* v. *Adams,* 225 Conn. 270, 275–76 n.3, 623 A.2d 42 (1993). We do not address the defendant's claim that the conviction was against the weight of the evidence because this claim is not briefed adequately for appellate review. See *Commissioner* v. *Youth Challenge of Greater Hartford, Inc.,* 206 Conn. 316, 322–23, 537 A.2d 480 (1988).

each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt because this court has held that a jury's factual inferences that support a guilty verdict need only be reasonable. *State* v. *Crafts*, 226 Conn. 237, 244, 627 A.2d 877 (1993). Nevertheless, because intent to cause the death of a person is an element of the crime; *State* v. *Raguseo*, supra, 120; that intent must be proven beyond a reasonable doubt. *Patterson* v. *New York*, 432 U.S. 197, 204, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977); *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Furthermore, [i]ntent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . *State* v. *Raguseo*, supra, 120.'' (Internal quotation marks omitted.) *State* v. *Sivri*, 231 Conn. 115, 126–27, 646 A.2d 169 (1994).

''We do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude.'' (Citation omitted; internal quotation marks omitted.) *State* v. *Henning*, 220 Conn. 417, 420, 599 A.2d 1065 (1991). ''This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict.'' (Internal quotation marks omitted.) *State* v. *Hart*, 198 Conn. 424, 427, 503 A.2d 588 (1986).

The evidence presented at the defendant's trial was sufficient to support the jury's finding beyond a reasonable doubt that he intended to kill Smith. Krowson, the eyewitness to the shooting, testified that the defendant and Smith argued heatedly immediately

before the shooting in question. During that exchange, the two men used profanity and looked like "they were going to get into a fight." As Smith attempted to withdraw from the argument by walking away and "waving off" the defendant in an inoffensive manner, the defendant shouted "Oh, yeah, you think I'm kidding," and removed a .38 caliber derringer pistol from his pocket. The defendant then raised the weapon to eye level, paused a "split second" as if to aim it and then fired once into the back of Smith, who was standing approximately twelve feet away from the defendant. "We have stated that [o]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill. . . . *State* v. *Holley*, 174 Conn. 22, 26, 381 A.2d 539 (1977)." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 680, 613 A.2d 788 (1992).

Likewise, the jury was free to infer an intent to kill from the defendant's failure to attempt to aid Smith or to show concern for Smith's welfare following the shooting. *State* v. *Francis*, 228 Conn. 118, 128–29, 635 A.2d 762 (1993); *State* v. *Greenfield*, supra, 228 Conn. 78. Consequently, there was sufficient evidence to support the jury's finding that the defendant, when he shot Smith, had the intent to kill him.[14]

---

[14] The defendant asserts that "the *lack* of what someone does can cast a reasonable doubt as to whether there was an intent to kill." (Emphasis in original.) The defendant claims that the following shows that he did not have the intent to kill Smith: (1) "there was profanity but no physical fighting"; (2) he "made no statement as to wanting to kill Smith"; (3) he "fired just one shot"; (4) he "neither boasted nor exulted, but quickly left"; (5) he "did not try to see if Smith had been hit or try inflicting further harm on him"; (6) he did not try to "finish him off"; (7) he aimed, but did not use "[c]areful aim"; and (8) there was "substantial doubt, voiced by [an] eyewitness, that the defendant had even tried to *hit* Smith with the fired bullet." (Emphasis in original.) To the extent that this evidence somehow indicates that the defendant did not intend to kill Smith, the jury was free

## II

The defendant next claims that the trial court improperly permitted the jury to take notes during his trial and to use them during deliberations. He first argues that the trial court violated his right to voir dire by permitting the jury to take notes during his trial, because he had learned, only after voir dire had concluded and just prior to the commencement of evidence, that the jury would be permitted to take notes. The defendant also argues that, even if the note-taking did not violate his right to voir dire, the trial court abused its discretion in permitting the jurors to take notes during his trial.

The following facts are relevant to this claim. On December 15, 1992, just prior to the commencement of evidence in the defendant's trial, the following colloquy occurred regarding the taking of notes by jurors during the defendant's trial:

"Ms. Brown [defendant's counsel]: First of all, Your Honor, I've been made aware that you [are] allowing the jurors to take notes from the trial in this case. And at this time, I'm going to object to that. This will be my first trial where notes were being—where our jury was allowed to take notes.

"This is a trial where the evidence is extremely short. We're talking—we're probably talking less than a week of testimony. You've got one juror in this case who is blind, and who is not capable of taking notes. I think that when people and jurors take notes they tend to become much more reliant on the notes than they do on the actual testimony as it's taking place and then it becomes the person with the best notes wins, and that's not what this is supposed to all be about.

to draw the contrary inference from the other evidence in the case. *State* v. *Stanley*, supra, 223 Conn. 681; *State* v. *Grant*, 219 Conn. 596, 604, 594 A.2d 459 (1991).

"So, I'm going to object to the fact that there's going to be note-taking during this case.

"The Court: Do you wish to be heard, Mr. Thomas [state's attorney]?

"Mr. Thomas: I generally don't like the taking of notes, Your Honor, but I'm not so entrenched against them that I'd take a position.

"The Court: Well, the Supreme Court has in no uncertain terms in my opinion approved the taking of notes. In my experience, I have prior to that decision by the Supreme Court, I had many requests by jurors who I spoke to following trials indicating to me that they had only—they had wished that they were able to take notes and they felt that they were at a disadvantage in not being able to take notes. They said that it's very helpful. I think that it's a fine tool, and I think especially I find it valuable when it comes to the charge.

"Now, in this particular case, we have four counts. They may not seem complicated to you, but when I read these statutes to them this morning, I think, that they will find it complicated, and I think, that they will find it very helpful if they are able to write some of this down. I find that I'm not recharging nearly anywhere near as much as I was prior to the note-taking.

"Now, as far as the blind juror is concerned, as I recall her response to questioning from counsel during the voir dire, [the blind juror] indicated that she has overcome her inability to read when she hears something articulated. And she indicated, as I recall, that she felt that she was handicapped in no way by her inability to see exhibits. That she was handicapped in no way by her inability to read what was in front of her. She also, as I—as we all know, she is an attorney. She has a basic understanding of the judicial process. I think that from what I heard from her, that she has overcome this handicap.

"Now, I suppose, if your argument were to be correct, that if we had a juror with no hands, on the—in the jury, that the other eleven should be prohibited from taking notes because one person couldn't write. I don't think that that is what this is all about. People have handicaps and both counsel found that, and I think rightfully so from what I heard, that [the blind juror] was capable of being a juror and could give both sides a fair trial and could understand the proceedings and was able to appreciate the exhibits.

"Now, it seems to me that we have to accept the fact that we may have handicapped people on our juries with different handicaps all the time and to make that a determining factor in the allowing or not allowing jurors to take notes, is not the way to go. I think that this case certainly has enough in it, and especially with four counts, that the jury might very well be aided by their ability to take notes. I think that it has been approved and I'm going to allow them to do it." There was no further argument on the issue of note-taking at that time.

Thereafter, in the course of making introductory remarks to the jury, the trial court explained the permissible role of note-taking as follows: "I would like to talk to you a little bit about note-taking. And you have learned already, you will be permitted to take notes during this trial. Let me emphasize some ground rules for you regarding note-taking. Notes are a sound tool to help you refresh your recollection during the deliberative phase of this trial; however, notes per se are not sacrosanct. If there is a conflict between your notes and your recollection, it is your recollection that must prevail.

"Additionally, if there is a conflict between your recollection and the notes of a fellow juror, it is your recollection that should prevail. Your notes are not evi-

dence. You will recall my earlier definition of what constitutes evidence. Your verdict must be based exclusively on evidence presented at trial and the principles of law charged.

"The note-taking process should not distract upon your focus of the witness because the credibility you ascribe to a witness is critical, it is essential that you do not allow note-taking to interfere or to impede your ability to view the witness, to listen to him or her, and to size him or her up, and that is to properly evaluate the witness. You should not be so preoccupied with taking notes that you overlook what the witness is saying and how that witness is saying it. Whatever notes you take become your own personal property. You are not to exchange or discuss your notes with your fellow jurors during the trial itself. You may do so if you elect during the deliberation phase.

"Just as you cannot discuss or deliberate this case amongst yourselves until the case has been completed. So, you cannot exchange or discuss your notes during the trial's pendency. There is no requirement, of course, that notes be taken. This is an option to be exercised by each of you individually. Those of you who elect not to take notes will be no less conscientious than jurors who take notes.

"The juror who takes few or no notes should not permit his or her individual recollection to be necessarily influenced by a juror whose notes may differ from that recollection. Notes are only a tool and are not necessarily accurate and do not assume that a voluminous note taker is necessarily accurate in every respect.

"Finally, notwithstanding note-taking by you and your fellow jurors, do not hesitate to seek a replaying of the testimony or the charge if you deem it essential during your deliberations."

During its final instructions to the jury, the trial court further explained the role of note-taking as follows: "I want to talk to you just for a moment about your notes which I mentioned previously. Remember that they are merely aids to your memories and should not be given precedence over your independent recollection of the evidence. A juror who has not taken notes should rely on his or her recollection of the evidence and should not be influenced by the fact that other jurors have done so. You have already been advised that you should not allow note-taking to distract you from paying proper attention to the evidence presented to you."

On November 10, 1993, the defendant moved the trial court to rectify the record to reflect: (1) at what stage of the proceedings the trial court first informed the parties that it would allow jurors to take notes; (2) whether the trial court had the clerk pass out materials for note-taking during or after telling the jurors that they would be permitted to take notes; and (3) to the extent necessary, whether prospective jurors had been questioned about note-taking during voir dire. On March 9, 1994, at a hearing on the defendant's motion for rectification, the trial court stated: (1) that it first informed counsel of the note-taking during a pretrial chambers conference, prior to the opening of court on the date that evidence commenced; (2) that materials were passed out to jurors just prior to the mini-charge, at which time they were informed that they would be able to take notes; and (3) that jurors had not been questioned about note-taking during voir dire. Further, trial counsel for the defendant, in response to a question on cross-examination about what questions she would have asked a juror about note-taking during voir dire, testified at the hearing that she would "let the jury know that they were—the juror—the prospective juror know that—that notebooks would be made available. Did they feel comfortable with the concept of hearing informa-

tion and taking notes simultaneously to that? Do they think they would be reliant on their notes when it came to deliberations? Or, did they think they would still rely on their memories? What they would do in a situation if their notes differed from somebody else's notes during the deliberation process? Off the top of my head, those are the things I can think of."

## A

The defendant first contends that, in light of the well documented limitations associated with juror note-taking, the trial court's failure to afford him the opportunity to question jurors on that issue during voir dire amounts to a statutory and constitutional violation. Further, he argues that, even if this denial of voir dire, in and of itself, does not establish that he was prejudiced by the violation, the state cannot show that the violation was harmless beyond a reasonable doubt. We disagree.

### 1

We first discuss the basis for our review of this claim. The defendant contends that, although he did not specifically object at trial to the juror note-taking on the basis of a claimed constitutional or statutory right to voir dire, he properly preserved this issue for appeal on the basis of the totality of his objection to allowing juror note-taking. In the alternative, he argues that this claim is reviewable based on the authority of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), the plain error doctrine or this court's inherent supervisory powers.

We are unpersuaded that the defendant properly preserved this particular claim at trial. Although counsel for the defendant did object generally to the trial court's intention to permit jurors to take notes, she did not base this objection on the defendant's constitutional or

statutory right to conduct voir dire. Instead, her only stated grounds for objecting were that (1) it was her first trial "where our jury was allowed to take notes," (2) the evidence was "extremely short," (3) one juror was blind and therefore "not capable of taking notes," and (4) "when people and jurors take notes they tend to become much more reliant on the notes than they do on the actual testimony as it's taking place and then it becomes the person with the best notes wins, and that's not what this is supposed to all be about." This explanation did not "distinctly raise" a claim that the defendant had been denied his right to conduct voir dire. See Practice Book § 4185. Thus, we must consider whether this claim satisfies the standards set forth in *Golding*.

To prevail under *Golding*, the defendant must establish *all* of the following conditions: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40. We may "respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." Id., 240. Applying this standard, we conclude that this claim fails under the third prong.[15]

---

[15] We note, however, our disagreement with the state's argument that the record is inadequate for *Golding* review because there is "no unambiguous evidence that the jurors here went beyond mere receipt of pads and writing implements and actually engaged in note-taking." The trial court's charge implicitly recognized that at least some jurors had taken notes during the trial. Nonetheless, a party who seeks to claim some impropriety in connection with jury note-taking would be well advised to ask the trial court to indicate on the record that notes were actually taken. Further-

2

In order to determine whether there was a clear violation of the defendant's constitutional rights, we must focus on the actual scope of his claim. In this case, unlike others in which we have considered whether the trial court violated the defendant's right to question jurors during voir dire, the defendant does not assert that he attempted to ask jurors specific questions pertaining to note-taking and that the trial court denied him the opportunity to ask those particular questions. Cf. *State* v. *Couture*, 218 Conn. 309, 317–19, 589 A.2d 343 (1991); *State* v. *Dolphin*, 203 Conn. 506, 510, 525 A.2d 509 (1987). Instead, the gravamen of his claim is that the trial court, by disclosing, just prior to the commencement of evidence, its intent to permit the jurors to take notes, effectively denied him the opportunity to ask *any* questions during voir dire regarding note-taking. The success of this claim necessarily relies, therefore, on the underlying assumption that the defendant had no reason to question prospective jurors about note-taking prior to the time when the trial court expressly informed the parties that it would permit jurors to take notes during the defendant's trial. Because we believe that the defendant had reason to know, prior to voir dire, that jurors might be permitted to take notes during his trial and, therefore, that the defendant had sufficient reason to question jurors about note-taking if he were so inclined, the assumption underlying his claim founders. Consequently, even if we assume that the defendant had a constitutional right to question jurors during voir dire about note-taking, we conclude that the defendant was not denied that right.

more, because we conclude that the defendant has failed to show that "the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial"; *State* v. *Golding*, supra, 213 Conn. 240; the defendant cannot prevail based on the plain error doctrine, and we perceive no reason to exercise our supervisory powers under the circumstances of this case.

In *Esaw* v. *Friedman*, 217 Conn. 553, 556–64, 586 A.2d 1164 (1991), this court considered, inter alia, whether the trial court, in the context of a civil trial arising from a motor vehicle accident, improperly permitted the jurors to take notes during the trial and to use them during deliberations. Despite the plaintiff's failure to object properly at trial, we reviewed the claim "in the interests of justice and the public welfare"; id., 558; see *Kavanewsky* v. *Zoning Board of Appeals*, 160 Conn. 397, 401, 279 A.2d 567 (1971); and expressly concluded that trial courts have the discretion to permit jurors to take notes during the trial. *Esaw* v. *Friedman*, supra, 559. We reached this conclusion on the basis of three factors: "(1) the overwhelming weight of authority supporting such discretion; (2) a critical evaluation of the arguments for and against such a procedure; and (3) sound judicial policy and our abiding faith in the common sense of jurors." Id.

First, we recognized that "[t]he vast majority of jurisdictions that have considered the issue entrust the decision of whether jurors should be permitted to take notes to the sound discretion of the trial court. The federal courts are virtually unanimous; and our sister states nearly so." Id., 559–60; see id., 559–61 nn.8 and 9. Second, we acknowledged and found unpersuasive the principal arguments against permitting jurors to take notes during trial. We identified that the arguments against such a procedure are: "(1) the best note-taker will dominate the jury; (2) since jurors are not trained in note-taking, they will focus on trivial matters to the detriment of vital facts; (3) a dishonest juror may falsify his notes; (4) debate within the deliberation room over whose notes are more accurate will detract from the deliberation process; and (5) the process of taking notes will distract jurors from watching and listening to the witnesses and will cause them to miss testimony. III A.B.A. Standards for Criminal Justice [(2d Ed. 1980)

commentary,] p. 15.85; D. Petroff, 'The Practice of Jury Note Taking—Misconduct, Right, or Privilege?' 18 Okla. L. Rev. 125, 130 (1965).

"Each of these arguments, however, carries with it a legitimate response. (1) It is likely that certain jurors will be more influential with their colleagues than others in any event, and unlikely that the process of note-taking alone will distort the deliberative process. (2) Jurors are no less trained in note-taking than people in other walks of life who often rely on notes to record and recollect their perceptions, and the risk that a case may turn on an imperfect or faulty set of notes is no greater than that it may turn on an imperfect or faulty memory. (3) A dishonest juror may equally 'falsify' his memory, and the presence of the other jurors' notes may well be more persuasive in correcting that falsity. (4) There is no more risk that jurors' notes will prompt debate over whose notes are better than reliance solely on the jurors' memories will prompt debate on whose memory is better. (5) The risk that taking notes may distract a juror is no greater than the possibility that taking notes may increase the juror's attention to the testimony.

"We need not decide whether, in the abstract, the risks involved in the process of note-taking by jurors outweigh or are outweighed by the benefits that may flow therefrom. We are convinced 'that the benefits are substantial enough to allow trial judges to decide, in each case, whether note-taking should be permitted.' *United States* v. *Maclean*, 578 F.2d 64, 66 (3d Cir. 1978). We are also convinced, as was the court in *United States* v. *Maclean*, supra, [66,] that 'the dangers of note-taking can be substantially avoided by proper instruction to the jury.' The court should instruct the jurors that their notes are merely aids to their memories and should not be given precedence over their independent recollection of the evidence, that a juror who has not taken

notes should rely on his recollection of the evidence and should not be influenced by the fact that other jurors have done so, and that they should not allow their note-taking to distract them from paying proper attention to the evidence presented to them. Id." *Esaw* v. *Friedman*, supra, 217 Conn. 562–63.

Third, we stated that "considerations of sound judicial policy and faith in the common sense of jurors lead us to conclude that a trial judge should have the discretion to permit such a procedure. The human memory is fallible, and notes may significantly aid in recalling evidence. Judges sitting as trial courts routinely take notes, as do students, business persons, journalists and people in all walks of life who are intent on being able to recall later the specifics of what they see and hear. As a matter of ordinary human experience, we usually have no compunctions about the ability of these people to engage in the process and use its product appropriately. There is no valid reason to treat jurors, who after all are chosen from the same pool of experience, any differently. Furthermore, we · . . . have held that it is within the trial court's discretion to permit jurors to ask questions of witnesses. See *Spitzer* v. *Haims & Co.*, 217 Conn. 532, 587 A.2d 105 (1991). Permitting jurors to take notes may aid them in preserving for their own memories those questions that they may wish to pose . . . ." *Esaw* v. *Friedman*, supra, 217 Conn. 563–64.

We believe that our decision in *Esaw*, released approximately twenty-one months before the start of voir dire in the defendant's trial, sufficiently placed the defendant on notice that the trial court had discretion to permit the jurors in his case to take notes and to use those notes during their deliberations. We acknowledge that *Esaw* did not specifically hold that trial courts have discretion to permit jurors to take notes in criminal trials. That case involved an appeal from a civil trial,

and we therefore had no reason to fashion our holding more specifically than to state that "[we] conclude that a trial court has discretion to permit jurors to take notes during the trial." Id., 559. Nonetheless, despite this lack of specificity, this decision cannot be read as precluding the practice of note-taking by jurors in criminal trials.

An examination of our opinion in *Esaw* establishes that the decision applies equally to the practice of note-taking by jurors in both civil and criminal trials. First, most of the cases in *Esaw* to which we cited and upon which we relied in approving note-taking by jurors were criminal cases. Id., 559–64 and nn.8 and 9; see, e.g., *United States* v. *Oppon*, 863 F.2d 141, 148–49 (1st Cir. 1988); *United States* v. *Vaccaro*, 816 F.2d 443, 451 (9th Cir.), cert. denied sub nom. *Alvis* v. *United States*, 484 U.S. 914, 108 S. Ct. 262, 98 L. Ed. 2d 220 (1987). For example, in evaluating the potential risks incident to the use of note-taking by jurors, we cited to and quoted from *United States* v. *Maclean*, supra, 578 F.2d 64, which had approved the use of note-taking by jurors in criminal trials. Second, we found support for our approach in the American Bar Association Standards for Criminal Justice and in the Uniform Rules of Criminal Procedure, both of which discuss the use of note-taking by jurors in criminal trials.

Because the *Esaw* decision placed the defendant on sufficient notice, prior to voir dire, that the trial court might permit the jurors to take notes during his trial, he had ample opportunity to seek to ask jurors questions pertaining to note-taking if he believed that such questions were truly relevant to his case. At that time, the trial court would have had the opportunity to rule on the merits of the proposed questions in accordance with our law pertaining to the right of parties to question jurors during voir dire. See, e.g., *State* v. *Couture*, supra, 218 Conn. 317–19; *State* v. *Dolphin*, supra, 203

Conn. 510. In light of the defendant's failure to attempt to ask such questions during voir dire or, at the least, to ask the trial court prior to voir dire whether jurors would be permitted to take notes during the trial, we conclude that the defendant was not denied the opportunity to ask such questions.[16] Accordingly, the defendant cannot prevail under the four prong test stated in *Golding.*

B

The defendant next argues that the trial court abused its discretion in permitting the jurors to take notes during his trial. He bases this claim on the combined effect of the following circumstances: (1) the trial court failed to articulate its grounds for permitting note-taking by the jury under the facts and circumstances of his particular trial; (2) the trial court "stated that [it] had been frequently, if not always, permitting the practice of note-taking since *Esaw*"; (3) the trial court did not dis-

---

[16] We reject the defendant's reliance on *United States* v. *Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963), for the proposition that a trial judge has the obligation to inform counsel, prior to voir dire and without a request by counsel, of its intent to permit jurors to take notes. As the defendant concedes, *Standard Oil Co.* involved a trial in which the trial judge effectively *required* jurors to take notes. See id., 897 ("practice of compulsory note-taking which was followed in the case at bar, should not be encouraged"). Further, the trial judge in that case apparently had not instructed the jury on the proper use and limited purposes of note-taking. In contrast, a trial judge of the Connecticut state courts may only *permit* jurors to take notes and, if that judge so permits, must fully instruct the jurors on the proper use and purposes of note-taking. See *Esaw* v. *Friedman*, supra, 217 Conn. 563. Thus, unlike in this case, *Standard Oil Co.* involved a substantial risk that jurors, unskilled and uninstructed in note-taking, would prejudice the trial, and that case, therefore, possibly warranted the precaution that "the court, as a very minimum, should, prior to the voir dire, notify counsel of its intent to direct the jury to take notes." *United States* v. *Standard Oil Co.*, supra, 897. Moreover, we are unpersuaded by the other cases upon which the defendant relies for this proposition. Such decisions are inherently premised upon an underlying presumption against juror note-taking to which we do not subscribe. See, e.g., *Price* v. *State*, 887 S.W.2d 949, 954–55 (Tex. Crim. App. 1994).

close until "long after the jury was picked" that jurors would be permitted to take notes; (4) the trial court stated that permitting jurors to take notes reduced the need for recharging the jury, but did not state that it had considered as an alternative the submission of written instructions to the jury as permitted by *State* v. *Jennings*, 216 Conn. 647, 665 n.10, 583 A.2d 915 (1990); and (5) the trial was not sufficiently complex or lengthy, and the charges were "very straightforward." We are unpersuaded that the trial court abused its discretion.

" '[T]he benefits [of note-taking by jurors] are substantial enough to allow trial judges to decide, in each case, whether note-taking should be permitted.' " *Esaw* v. *Friedman*, supra, 217 Conn. 563, quoting *United States* v. *Maclean*, supra, 578 F.2d 66. "Since the value of note-taking will vary according to the complexity and quantitative nature of each trial as well as according to the abilities and desires of the jurors, the decision on whether to permit note-taking is best left to the trial judge to make based on the circumstances of each case." *United States* v. *Maclean*, supra, 66. As in ruling on the relevancy of evidence or determining whether the probative value of evidence outweighs its prejudicial effect, the trial judge is in the best position to evaluate the myriad and often subtle factors upon which the exercise of such discretion depends. "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. *DiPalma* v. *Wiesen*, 163 Conn. 293, 298, 303 A.2d 709 [1972]. Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. *Thomas* v. *Thomas*, 159 Conn. 477, 480, 271 A.2d 62 [1970]; 1 Wharton, Criminal Evidence (13th Ed.) 241." (Internal quotation marks omitted.) *State* v. *Carr*, 172 Conn. 458, 464, 374 A.2d 1107 (1977).

We are unpersuaded that the trial court abused its discretion in permitting jurors to take notes. Further, we agree with the state that most of the defendant's arguments in support of this claim stem from his overly narrow reading of *Esaw*. In *Esaw*, we recognized the potential usefulness of note-taking for most jurors and responded to all the arguments generally asserted against permitting the practice. *Esaw* v. *Friedman*, supra, 217 Conn. 562–63. That decision made clear that there is no presumption of risk or prejudice associated with note-taking by jurors. Thus, we reject the defendant's position to the extent that it suggests that the trial court failed to give great weight to the pitfalls of note-taking by jurors. Further, although trial judges should consider the peculiarities of each individual case, this does not mean that they cannot or should not also consider their past experience and familiarity with juror behavior. Such insights from other cases may properly assist a trial judge in evaluating the potential usefulness of note-taking in each trial. Thus, we cannot conclude that the trial court acted improperly by considering, among other factors, its past success with juror note-taking.[17]

Also, contrary to the defendant's suggestion, there is no minimum level of case "complexity" below which a trial judge may not permit jurors to take notes. This is only one of various factors that may enter a trial judge's decision, and we are not in a position to second-guess the trial judge in this regard. Moreover, we are unpersuaded that the trial court's failure to cite to *State* v. *Jennings*, supra, 216 Conn. 647, shows that it failed to consider a "relevant factor" or reached a "mistaken conclusion" about the availability of giving the jurors

---

[17] In light of our prior discussion of the trial court's ruling on juror note-taking, we are also unpersuaded that the trial court failed to articulate sufficiently its reasons for allowing note-taking in the defendant's particular case.

written instructions. To the extent that this consideration was truly relevant to the trial court's decision to permit note-taking, the defendant could have raised an argument to that effect at trial.

Similarly, we must reject the defendant's argument that, because neither the trial court nor counsel had questioned prospective jurors during voir dire about note-taking, it was thereby not within the trial court's discretion to permit jurors to take notes during the trial. Again, this contention incorrectly assumes that a trial judge's decision to permit note-taking must begin with the presumption that potential jurors are incapable of taking notes during the trial. Under this view, a trial judge would be able to permit note-taking only after affirmatively inquiring into the capabilities of the jurors and finding them "fit" to take notes. "As a matter of ordinary human experience, we usually have no compunctions about the ability of [students, business persons, journalists and other similar persons] to engage in the process [of note-taking] and use its product appropriately. There is no valid reason to treat jurors, who after all are chosen from the same pool of experience, any differently." *Esaw* v. *Friedman*, supra, 217 Conn. 563–64.[18] Thus, especially in light of the fact that even the defendant did not deem this precise consideration important enough to raise during trial, we cannot conclude that the trial court was precluded from permitting jurors to take notes during trial merely because the jurors had not been questioned during voir dire specifically about note-taking.[19]

---

[18] Moreover, the trial court's comprehensive instructions on the permissible use of the notes substantially minimized, if not eliminated, the possibility that the jurors would take or use their notes improperly. See *Esaw* v. *Friedman*, supra, 217 Conn. 563 (" 'the dangers of note-taking can be substantially avoided by proper instruction to the jury' ").

[19] We note that, although the specific issue of note-taking was not discussed during voir dire, counsel had questioned at least one juror about her capabilities to serve as a juror and that the trial court subsequently

## III

Finally, we address the defendant's claim that the trial court's instructions related to the jury's duty caused him unfair prejudice because it "was unfairly imbalanced in favor of conviction."[20] The defendant concedes that we rejected the merits of a virtually identical claim in both *State* v. *Francis,* supra, 228 Conn. 133–35, and *State* v. *Walton,* 227 Conn. 32, 63–66, 630 A.2d 990 (1993), and he acknowledges that, because he failed to object to the instruction at trial, this claim

based its decision to permit note-taking, in part, on that information. The trial court stated that "as far as the blind juror is concerned . . . she has overcome her inability to read when she hears something articulated. . . . [S]he [feels] that she was handicapped in no way by her inability to see exhibits. . . . I think, that from what I heard from her, that she has overcome this handicap." This demonstrates that the trial court did, in fact, consider those concerns about individual jurors that were apparent or had been raised by the parties.

[20] The defendant challenges the following jury instruction: "The accused justly relies upon you to consider carefully his claims, to consider carefully all of the evidence and to find him not guilty if the facts and the law require such a verdict. He rightfully expects fair and just treatment from you.

"At the same time, the State of Connecticut and its people look to you as sworn officers of this Court to deal fairly, firmly, honestly and justly, as strong-minded men and women, with the interests placed in your hands as an arm of the Court to aid in upholding the law of the land and to render a verdict of guilty if the facts and law require such a verdict."

Immediately following this challenged portion of the charge, the trial court stated: "The State does not want the conviction of persons who are not guilty or of any person of whose guilt upon the evidence there is a reasonable doubt. The State is as much concerned in having a not guilty person acquitted as in having a guilty person convicted but for the safety and well-being of society and the protection of life and property, the State is concerned in securing the conviction of persons who have been proven by the evidence beyond a reasonable doubt to be guilty of committing the crimes charged in this information.

"It is the sworn duty of the Courts and jurors to safeguard the rights of persons charged with crime by respecting the presumption of innocence which the law gives to every person. If and when the presumption of innocence has been overcome by evidence proving beyond a reasonable doubt that an accused person is guilty of the crime charged, then it is the sworn duty of the jury to enforce the law and render a verdict of guilty."

will not prevail under the criteria of *State* v. *Golding*, supra, 213 Conn. 239–40. See *State* v. *Walton*, supra, 64.

The defendant, nevertheless, asks this court to reconsider *Francis* and *Walton* and conclude that the instruction violated his right to a fair trial. We agree with both the defendant and the state that this claim is governed by our decision in *State* v. *Walton*, supra, 227 Conn. 62–66. We perceive no material difference between the instruction in this case and that at issue in *Walton*. This claimed instructional error is not constitutional in nature and therefore fails the second prong of *Golding*, which is that " 'the claim is of constitutional magnitude alleging the violation of a fundamental right.' " Id., 64–65. Further, we believe that, as in *Walton*, other, unchallenged portions of the charge; see footnote 20; sufficiently conveyed to the jury the necessity of proof beyond a reasonable doubt and the presumption of innocence. *State* v. *Walton*, supra, 66. Consequently, we see no reason to reconsider these cases, and we reject this claim.

The judgment of the trial court is affirmed.

In this opinion the other justices concurred.