## STATE OF CONNECTICUT *v.* DONALD COUTURE
### (13725)

PETERS, C. J., CALLAHAN, COVELLO, BORDEN and SANTANIELLO, Js.

Argued December 12, 1990—decision released April 16, 1991

*John R. Williams,* special public defender, for the appellant (defendant).

*Mitchell S. Brody,* assistant state's attorney, with whom were *Marcia Smith,* senior assistant state's attorney, and, on the brief, *John A. Connelly,* state's attorney, and *Bradford J. Ward,* supervisory assistant state's attorney, for the appellee (state).

SANTANIELLO, J. The defendant appeals from the judgment of conviction, after a jury trial, of three counts of felony murder in violation of General Statutes § 53a-54c.[1] He was sentenced to three terms of

---

[1] General Statutes § 53a-54c provides in pertinent part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except

imprisonment of twenty-five years to life, such sentences to run consecutively, for a total effective sentence of seventy-five years to life.

The defendant was indicted by a grand jury in 1979 for the commission of three murders in the course of an armed robbery. He was convicted after a jury trial in 1981 and appealed. That conviction was reversed by this court. *State* v. *Couture,* 194 Conn. 530, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985) (*Couture I*). A second trial that commenced in November, 1986, culminated in a mistrial. A third trial, commenced on May 9, 1989, led to the convictions from which the defendant presently appeals.

In his appeal the defendant alleges that the trial court improperly: (1) conducted the voir dire process on the first day of the Jewish holiday of Passover; (2) restricted voir dire examination of a prospective juror who had served on a prior criminal jury; (3) limited cross-examination of the state's chief witness as to an alleged prior accusation; (4) permitted the state to introduce the hearsay statements of a coparticipant in the crimes through the testimony of the state's chief witness; (5) denied the defendant a speedy trial; and (6) denied the defendant's motion to suppress the fruits of the searches and seizures conducted at his house at the time of his arrest. During oral argument before this court, counsel for the defendant withdrew the speedy trial claim from consideration.

that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

The facts that the jury could reasonably have found from the evidence presented at trial are virtually indistinguishable from those described by this court in *Couture I,* supra, 532: "On the early morning of April 16, 1979, the police were called to the Purolator Armored Car garage in Waterbury where three guards, Leslie Clark, Edward Cody and William West, were found shot to death. Each body suffered multiple gunshot wounds, and the exterior and interior of the garage were littered with 24 expended 30 caliber shell casings fired from two M-1 semi-automatic carbines. The truck [that] Cody and West had driven from Hartford early that morning into the Waterbury garage where Clark was working alone was riddled with bullet holes, and its contents, a shipment of approximately 1.8 million dollars in cash, checks, food stamps and jewelry were missing."

Two witnesses for the state, Evelyn Vega and Donna Souza, testified about a plan, formulated in February of 1979, to rob the Purolator Armored Car garage in Waterbury. Vega, Souza, Patricia Dolphin, Lawrence Pelletier and the defendant were involved in planning this robbery. Vega and Souza testified as state's witnesses and implicated the defendant as one of the two people involved in committing the crime. They testified that, after returning to the defendant's home immediately after the robbery, Pelletier and the defendant had described the robbery and murders, and then had proceeded to transport all of the weapons and fruits of the crime from their pickup truck into the house. Certain of the contraband and weapons were then moved to the home of Pelletier and Vega, who were living together. Thereafter, on the basis of a statement given by Dolphin on April 17, 1979, the police executed a search warrant on the defendant's home in Wallingford and discovered numerous items, including two

large sacks of money, a money bag, garbage bags full of money and coins. Also found in the basement was a locked, grey metal cabinet. It contained, among other things, a briefcase full of money, black sneakers, gloves, a Connecticut license plate, wire cutters, two carbine rifles, tape, and clips of ammunition. A key on a leather loop attached to the defendant's pants fit the lock on the metal cabinet. A Cadillac automobile and a green pickup truck were discovered in the area behind the defendant's residence.

The continuing police investigation was able to match all but one of the deposit bags taken from the defendant's residence with the deposit bags listed on the bills of lading for the armored car in the Purolator garage. In addition, the Waterbury police laboratory determined that two of the cartridge casings discovered in Pelletier's basement had been ejected from the same weapon as ten of the casings taken from the crime scene; that all of the cartridge casings, bullets, and bullet fragments taken from the crime scene or the bodies of the slain guards were linked to the two carbines found in the defendant's basement; that the victims had been shot by both of the carbines; and that the wire cutters found in the defendant's basement had severed a chain behind the Purolator garage.

During the trial, Souza, the defendant's former wife was cross-examined as to whether she had, on a prior occasion, falsely accused her lawyer of rape. The state's objection was sustained, and the defendant attempted through a series of voir dire questions to qualify the line of questioning but failed. He now claims that his sixth amendment right to confront and cross-examine his accusers has been unconstitutionally denied.

The defendant also objected to the testimony of Vega, who testified in great detail about statements that

Lawrence Pelletier made privately to her, in the absence of the defendant, in which Pelletier supposedly provided a graphic description of the robbery and killings and the role of the defendant in committing these crimes. The court ruled that the statements were admissible under the coconspirator exception to the hearsay rule. The defendant claims that the statements did not fall within the exception and should have been excluded on federal constitutional grounds.

The defendant further moved to suppress the fruits of the searches and seizures conducted at his house at the time of his arrest. These searches yielded the murder weapons and most of the loot taken from the Purolator garage. A motion to suppress on the same grounds was denied by the trial court, *Hull, J.*, in the first trial, and upon appeal, this court affirmed Judge Hull's ruling. *Couture I,* supra, 531–47.

I

The defendant first claims that the trial court should not have held jury selection on the first day of Passover, an important Jewish holiday. He argues that religiously observant Jews would not serve on a jury on the first day of Passover, and thus, that he was deprived of his constitutionally guaranteed right to a jury truly representative of the community.

The factual background for this claim arises out of the timing of the voir dire, which commenced on April 18, 1989, and concluded on May 4, 1989. Over the defendant's objection, jury selection was held on April 20, 1989, the first day of Passover. The defendant challenged the entire panel and each venireman called that day on the ground of intentional exclusion of observant members of the Jewish faith. During jury selection proceedings that day, two jurors were selected for service, and the defendant exercised two peremp-

tory challenges. On May 3, with fewer than twelve jurors selected, the defendant exhausted his peremptory challenges. He then moved for the restoration of at least one peremptory challenge to replace those he was forced to exercise on the first day of Passover. The motion was denied and an exception taken. On May 9, the defendant renewed his claim, and introduced into evidence an affidavit of a rabbi and an excerpt from a book entitled "Gateway to Judaism," by Albert M. Shulman. This introduction was insufficient to establish an adequate factual basis.

The defendant's challenge is based on the sixth and fourteenth amendments to the federal constitution. The fourteenth amendment has long been held to forbid unequal treatment at the venire stage of jury selection. *Strauder* v. *West Virginia,* 100 U.S. 303 (1879). Likewise, the sixth amendment guarantees criminal defendants an "impartial jury"; *Holland* v. *Illinois,* 493 U.S. 474, 480, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990); that is, a jury drawn from a representative venire that reflects a "fair cross section of the community." Id.; *Taylor* v. *Louisiana,* 419 U.S. 522, 527, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975).

The defendant's equal protection claim warrants little discussion. To prevail on an equal protection challenge, the defendant must first show that the group alleged to be excluded is a distinct or cognizable group within the community. *Castaneda* v. *Partida,* 430 U.S. 482, 494, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977) (grand jury venire). A group is considered "cognizable" "only upon a showing . . . that the group has 'a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common

thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace.' " *State* v. *Haskins,* 188 Conn. 432, 438, 450 A.2d 828 (1982), habeas corpus granted sub nom. *Alston* v. *Lopes,* 621 F. Sup. 992 (D. Conn. 1985), aff'd sub nom. *Alston* v. *Manson,* 791 F.2d 255 (2d Cir. 1986), cert. denied, 479 U.S. 1084, 107 S. Ct. 1285, 94 L. Ed. 2d 143 (1987); see also *Willis* v. *Kemp,* 838 F.2d 1510, 1514 (11th Cir. 1988), cert. denied sub nom. *Willis* v. *Zant,* 489 U.S. 1059, 109 S. Ct. 1328, 103 L. Ed. 2d 596 (1989).

Although Jews as a whole have been recognized as a "cognizable" group; see *United States* v. *Gelb,* 881 F.2d 1155, 1161 (2d Cir.), cert. denied, 493 U.S. 994, 110 S. Ct. 544, 107 L. Ed. 2d 541 (1989); it does not follow that the smaller class of observant Jews also constitutes a cognizable group. Applying the definition of "cognizable group" to observant Jews, we conclude that two of the elements of the definition have not been satisfied. First, there is no factor which defines and limits the group. Rather, a person who is an observant Jew one day, week or month may decide the following day, week or month not to observe to the same extent, or perhaps not at all. Thus, membership in the group of "observant Jews" may shift from day to day or year to year. Therefore, the first element of "cognizability" has not been satisfied.

Second, it has not been shown that the interests of observant Jews could not be adequately protected if the

group were excluded from the jury selection process. *Willis* v. *Kemp,* supra, 1514. There has been no showing that partiality or bias would result on the part of the remaining jurors in the absence of the small group of observant Jews who would choose not to serve on a jury on the first day of Passover. *State* v. *Haskins,* supra, 438.

We therefore conclude that observant Jews do not constitute a cognizable group for purposes of the defendant's equal protection claim.

With regard to the defendant's sixth amendment claim, we note that the defendant initially bears the burden of establishing a prima facie violation of the fair cross section requirement. *State* v. *Castonguay,* 194 Conn. 416, 421–22, 481 A.2d 56 (1984). He " 'must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' *Duren* v. *Missouri,* [439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)]." *State* v. *Castonguay,* supra, 421–22.

The defendant's claim fails to address the first two required showings; for this reason, and for want of an adequate factual basis in the record, this claim must fail. The defendant, for instance, has not shown what percentage of the population of the Waterbury judicial district is Jewish. We lack, therefore, a sufficient factual basis from which to determine whether Jews residing in the Waterbury judicial district are "sufficiently numerous and distinct"; see *Duren* v. *Missouri,* supra, 364; *Taylor* v. *Louisiana,* supra, 531; such that their sys-

tematic exclusion from jury panels would violate the fair cross section requirement. Id. Neither can we determine, given the dearth of statistical evidence, whether the representation of Jews in Waterbury panels of veniremen was fair and reasonable in relation to the number of Jews residing in the judicial district. Id. Relying for factual support solely on the affidavit and excerpt from the book, the defendant asserts no more than that the holding of jury selection on the first day of Passover worked systematically to exclude observant Jews from the jury selection process. " 'Substantiation of [this] claim . . . "requires something more than defense counsel's speculation." ' *State* v. *McClain,* 171 Conn. 293, 294–95, 370 A.2d 928 (1976)." *State* v. *Grant,* 8 Conn. App. 158, 160–61, 511 A.2d 369 (1986). This claim, lacking sufficient evidentiary support, cannot be sustained.

Finally, the defendant has failed to show that observant Jews were in fact systematically *excluded* from serving on his jury. At the hearing on this matter, the state called David Jackson, jury administrator, who testified that while the judicial department did not record the reasons given by prospective jurors for postponing jury service, the defendant was free to obtain the names and addresses of those persons who did postpone on the date in question, and to contact them in this regard. The defendant has offered no evidence that he did so and has not shown that a single person actually postponed jury service on account of Passover.

## II

The defendant next claims that the trial court improperly limited his voir dire examination of a prospective juror who had served on a prior jury that had returned a verdict. Specifically, the defendant argues that he should have been permitted to ask the prospective juror

whether the prior jury's verdict was guilty or not guilty. The trial court sustained the state's objection to this question. After the trial court rejected the defendant's challenge for cause, he expended his last peremptory challenge to exclude this prospective juror. He claims that he was thus unable to exclude the twelfth juror, a woman whom he would have excluded had he not been forced to expend his last peremptory challenge in the manner described.

A criminal defendant is guaranteed the right to exercise peremptory challenges in the selection of his jury. Conn. Const., art. I, § 19, as amended by art. IV of the amendments to the constitution; General Statutes § 52-240. Additionally, "General Statutes § 54-82f provides the right to a voir dire examination of each prospective juror in a criminal action. It is firmly established therefore that '[t]he right to question each juror individually by counsel shall be inviolate.' See, e.g., *State* v. *Dolphin,* 203 Conn. 506, 511, 525 A.2d 509 (1987)." *State* v. *Fritz,* 204 Conn. 156, 160–61, 527 A.2d 1157 (1987). "The extent of the voir dire examination rests largely within the discretion of the trial court, and the exercise of such discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." Id., 161.

"[I]n exercising its discretion, the court should grant such latitude as is reasonably necessary to accomplish the twofold purpose of voir dire: to permit the trial court to determine whether a prospective juror is qualified to serve, and to aid the parties in exercising their right to peremptory challenges. *State* v. *Rogers,* [197 Conn. 314, 318, 497 A.2d 387 (1985)]." Id. The defendant, relying upon the distinction drawn in *Fritz,* claims that although the issue of whether the prospective juror's prior jury returned a verdict of guilty or not guilty "has nothing particularly to do with fitness to

serve, it has everything to do with the possible predispositions of a juror in a criminal trial and, thus, with the intelligent exercise of a peremptory challenge." We disagree with the defendant's reasoning.

A jury is presumed to have followed the trial court's instructions. *State* v. *Boscarino,* 204 Conn. 714, 723, 529 A.2d 1260 (1987). A criminal jury's sole function is to set aside the personal prejudices of its individual members, to weigh dispassionately the evidence set before it, and, on the basis of the trial court's instructions, to determine whether the state has proved the defendant's guilt beyond a reasonable doubt. See *State* v. *Williams,* 202 Conn. 349, 355, 521 A.2d 150 (1987); *State* v. *Asherman,* 193 Conn. 695, 739, 478 A.2d 227, cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985). That a jury returns a verdict of guilty in a given case, therefore, has nothing to do with the "possible predispositions" of a juror, and everything to do with the particular factual and legal contours of the case as it was presented to the jury. Standing alone, the fact that a jury returns a guilty verdict is not probative of the personal views of the individual jurors. The trial court did not abuse its discretion in sustaining the state's objection to the defendant's question.

## III

The defendant next claims that the trial court improperly limited his cross-examination of an important state's witness, thus abridging his right of confrontation under the sixth amendment to the federal constitution. The following facts are pertinent to this claim.

On cross-examination, the defendant asked the witness whether she had "previously falsely accused others of committing serious crimes." She said, "No, that's not true." The defendant then inquired whether the witness had "previously accused [her] own lawyer of

raping [her]." The state objected to the question and the jury was excused. In the absence of the jury, the witness answered the question with, "Yes, it is true." The state contended that the defendant was questioning the witness on a collateral matter, and elicited from the witness a statement that she had made the accusation and that it was true. After defense counsel's legal arguments against the state's objection failed, he alleged that the witness' accusation of rape was not true, her assertions to the contrary notwithstanding. Defense counsel alleged that the witness had "made a statement to third parties in which she specifically referred to the incident with that lawyer and stated that this was not a rape, that there was not intercourse, but rather simply that the lawyer had made a pass which she had rebuffed, and that was the end of it. . . . [W]e have specific proof from her own lips in which 'a', she accused him of raping her; 'b', she repudiated it." The court sustained the state's objection. Upon the jury's return, the witness was again asked whether her accusation against her lawyer was true. She answered, "Yes." Thereupon the court struck both the question and the answer.

The confrontation clause of the sixth amendment to the federal constitution guarantees criminal defendants the right to cross-examine adverse witnesses. *United States* v. *Owens,* 484 U.S. 554, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988). This guaranty is not, however, infinite. "The constitution does not require that the defendant be permitted to present every piece of evidence he wishes . . . ." *State* v. *Kelly,* 208 Conn. 365, 376, 545 A.2d 1048 (1988). The confrontation clause requires only that the defendant be afforded " 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.' " *Kentucky*

v. *Stincer,* 482 U.S. 730, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987), quoting *Delaware* v. *Fensterer,* 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). (Emphasis in original.) The sixth amendment is satisfied when an accused is given sufficient latitude on cross-examination to expose to the jury sufficient facts to permit the jury to draw inferences relating to a witness' reliability. *State* v. *Kelly,* supra, 375.

The sixth amendment guarantee of the right of cross-examination does not include "all evidence that is the least bit probative of credibility . . . ." *United States* v. *Bartlett,* 856 F.2d 1071 (8th Cir. 1988). In this case, the purportedly false allegation of rape was unrelated to the crimes at issue and would have been only weakly probative of general credibility. Evidence on this subject would not have been constitutionally mandated. Id., 1089. The probative value of the allegation was further weakened by Souza's insistence during defense voir dire that the allegation was true, a contention that was never challenged by contrary evidence. Moreover, the rest of the cross-examination of Souza was sufficient to satisfy the sixth amendment. Latitude was granted to the defense on cross-examination to elicit from Souza sufficient facts to draw inferences concerning her reliability. Her belief that she would benefit from her testimony by receiving favorable treatment in her posttrial incarceration was sufficient for the jury to draw inferences concerning her reliability. The trial court properly declined to grant the defendant further latitude in cross-examination.

## IV

The defendant next claims that the trial court improperly permitted Vega, a state's witness, to testify about statements made to her, in the absence of the defendant, by Pelletier, the defendant's coconspirator, concerning the commission of the crimes. Pelletier allegedly

made these statements after the commission of the robberies and shootings, during the time that he and the defendant were transferring the money and valuables from their pickup truck to the defendant's basement. The trial court overruled the defendant's objection to the admission of Vega's testimony, ruling that her testimony was admissible under the coconspirator exception to the hearsay rule.

"[I]t is well established that a co-conspirator's [hearsay] statement, made while the conspiracy is ongoing and in furtherance of the conspiracy, is an exception to the hearsay rule and as such, does not violate the confrontation clause. *State* v. *Spencer,* 198 Conn. 506, 513, 503 A.2d 1165 (1986)"; *State* v. *Pelletier,* 209 Conn. 564, 577, 552 A.2d 805 (1989); see also *Bourjaily* v. *United States,* 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987). The trial court's ruling turned, as does ours, on the question of when the conspiracy ended. The defendant argues that the conspiracy had achieved its principal objectives prior to Pelletier's statement to Vega; the state argues to the contrary.

This precise issue, based on a nearly identical factual background, presented itself in the coconspirator Pelletier's appeal. *State* v. *Pelletier,* supra. In that case, Couture was alleged to have made a statement to his wife regarding the crimes immediately before he and Pelletier unloaded the pickup truck. This court held that, as Pelletier and Couture had conspired to steal money, transport it to Couture's house and store it in his basement, Couture's statement, made before the goods had been transported from the truck to the basement, occurred while the conspiracy was still ongoing. Id., 577. The evidence introduced in the present case warrants the same holding with regard to the statement made by Pelletier while the goods were being moved to the basement.

The defendant argues, however, that, subsequent to our decision in *Pelletier,* federal courts, in two decisions; *United States* v. *Serrano,* 870 F.2d 1, 9 (1st Cir. 1989); *United States* v. *Vowiell,* 869 F.2d 1264, 1267 (9th Cir. 1989); have held that, with regard to the confrontation clause, the coconspirator exception is only available if the *chief* objective of the conspiracy is ongoing. According to the defendant, statements made during a "lingering conspiracy to conceal" are inadmissible.

We assess the significance of *Serrano* and *Vowiell* differently. In *Vowiell,* the main objective of the conspiracy was to escape from prison. The conspiracy was deemed to have ended when the escapees reached a place of temporary safety; *United States* v. *Vowiell,* supra, 1268–70; and the co-conspirator statements made thereafter were ruled inadmissible because they took place outside the scope of the conspiracy. Id. In *Serrano,* the statements in question were made in an attempt to conceal a conspiracy that had long since collapsed. See *United States* v. *Serrano,* supra, 7–9. As in *Vowiell,* the *Serrano* court ruled the statements inadmissible because the chief aim of the conspiracy was past when the statements were made. Id., 9. But see *United States* v. *Medina,* 761 F.2d 12, 18 (1st Cir. 1985) (conspiracy continued so long as coconspirators were acting together to destroy incriminating evidence).

These cases do not purport to limit, other than factually, the general rule rendering coconspirators' statements admissible that was established by the United States Supreme Court; see *Grunewald* v. *United States,* 353 U.S. 391, 405, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957); and relied upon by this court in *Pelletier.* In the present case, as in *Pelletier,* the coconspirator's statements were made while the defendant and Pelletier were acting together to transport stolen goods to a safe hiding

place. Pelletier's statement, therefore, was made while the conspiracy was ongoing, not after the termination of the conspiracy (*Vowiell*), or as part of a secondary conspiracy to conceal (*Serrano*). The defendant's reliance on *Serrano* and *Vowiell* is misplaced, and the trial court properly admitted Vega's testimony regarding Pelletier's statement.[2]

## V

The final claim of the defendant was that the trial court should not have denied his motion to suppress the evidence seized from his home. This issue was briefed, argued and thoroughly analyzed in *Couture I,* supra, 536–48. We are unpersuaded that we should revisit this issue and accordingly adhere to the conclusion reached in *Couture I.*

The judgment is affirmed.

In this opinion the other justices concurred.

---

[2] Although the defendant mentions in his argument that a coconspirator's statement must be made not only contemporaneously with the conspiracy, but also in furtherance of it; *State* v. *Pelletier,* 209 Conn. 564, 577, 552 A.2d 805 (1989); he does not brief an argument that Pelletier's statement was not made in furtherance of the conspiracy. Any challenge to the admission of Pelletier's statement on this ground is, therefore, deemed abandoned. *Chaplin* v. *Balkus,* 189 Conn. 445, 447, 456 A.2d 286 (1983).