******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DONALD COUTURE *v.* COMMISSIONER
OF CORRECTION
(AC 36629)

Alvord, Prescott and Mullins, Js.

*Argued May 27—officially released October 27, 2015*

(Appeal from Superior Court, judicial district of
Tolland, Newson, J.)

*Evan K. Buchberger*, with whom, on the brief, was
*Michael D. Day*, for the appellant (petitioner).

*James M. Ralls*, assistant state's attorney, with
whom, on the brief, were *Maureen Platt*, state's attorney, and *Eva B. Lenczewski*, supervisory assistant
state's attorney, for the appellee (respondent).

*Opinion*

PRESCOTT, J. The petitioner, Donald Couture, appeals from the judgment of the habeas court denying in part his petition for a writ of habeas corpus.[1] The petitioner claims that the habeas court improperly (1) concluded that he failed to establish that his appellate counsel rendered ineffective assistance by failing to raise a double jeopardy claim in the petitioner's direct criminal appeal, and (2) rejected his freestanding double jeopardy claim. We disagree and, therefore, affirm the judgment of the habeas court.

This habeas petition arises out of the petitioner's conviction of the infamous murder and robbery of three guards at an armored car garage in Waterbury in 1979. The petitioner and a codefendant, Lawrence Pelletier, were tried jointly and convicted in 1981, but the convictions were overturned by our Supreme Court on the ground that the prosecutor had committed serious improprieties during closing arguments. *State* v. *Couture*, 194 Conn. 530, 560–65, 482 A.2d 300 (1984) (*Couture I*), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). The petitioner's second trial ended in a mistrial as a result of juror misconduct and the inability of another juror to complete service because of a personal reason (*Couture II*). The petitioner subsequently was tried and convicted after a third trial of three counts of felony murder. *State* v. *Couture*, 218 Conn. 309, 589 A.2d 343 (1991) (*Couture III*). He received a total effective sentence of incarceration for seventy-five years to life, and his conviction was affirmed on appeal. Id.

In *Couture III*, our Supreme Court set forth the following facts that reasonably could have been found by the jury, quoting from its prior decision in *Couture I*: "On the early morning of April 16, 1979, the police were called to the Purolator Armored Car garage in Waterbury where three guards, Leslie Clark, Edward Cody and William West, were found shot to death. Each body suffered multiple gunshot wounds, and the exterior and interior of the garage were littered with 24 expended 30 caliber shell casings fired from two M-1 semi-automatic carbines. The truck [which] Cody and West had driven from Hartford early that morning into the Waterbury garage where Clark was working alone was riddled with bullet holes, and its contents, a shipment of approximately 1.8 million dollars in cash, checks, food stamps and jewelry, were missing." Id., 312.

"Late in the afternoon of April 16, 1979, Patricia Dolphin came to the police with information that she had purchased an Iver Johnson M-1 carbine, serial number AAO5518, at the request of Evelyn Vega for Lawrence Pelletier of Waterbury. Mrs. Dolphin related that Pelletier had been recently planning an armed robbery of

the Purolator garage with a 'Donald' whom Pelletier would talk to on the telephone. Mrs. Dolphin did not then know Donald's last name, but at the trial Mrs. Dolphin later identified [the petitioner] as 'Donald.'

"Acting on this information, the police sought a search warrant for the Waterbury home of Lawrence Pelletier to search for the murder weapons, other tools and the stolen armored car shipment. They also sought a warrant for Lawrence Pelletier's telephone toll records. The search warrants were issued very early on the morning of April 17 and they were executed shortly thereafter.

"Found at Pelletier's home where Pelletier and Evelyn Vega lived were an attache case containing money, literature for a 30 caliber M-1 carbine and two expended shell casings ejected from the same M-1 carbine fired at the murder scene. The weapon itself and the robbery loot were not, however, at the Pelletier home.

"The telephone toll record search revealed that Lawrence Pelletier often called a Donald Couture of Wallingford. On the basis of this and other information, during the early morning hours of April 17, 1979, the police sought a search warrant for [the petitioner's] premises in Wallingford. The search warrant was issued, and before dawn on the 17th the police entered the home of [the petitioner]. There they found [the petitioner] hiding under his bed. In the basement of that home were located the stolen armored car shipment, consisting of approximately $1,800,000 in cash, checks, food stamps, jewelry, empty deposit bags, and deposit slips made out by Purolator customers and a gun locker containing two 30 caliber M-1 carbines. [The petitioner] was later found to have the key to the gun cabinet on his key chain.

"The two M-1's, one an Inland Marine model and the other the Iver Johnson, serial number AAO5518, bought for Pelletier, were examined and compared with expended cartridge cases and bullets found at the Purolater garage and with bullets recovered from the bodies and clothing of the slain guards. These latter bullets did not, as did other bullets, pass through the guards' bodies. Ten of the ejected cartridge cases at the murder scene came from the Iver Johnson carbine and fourteen had been ejected from the Inland Marine carbine. Bullets from the bodies of all three victims had been fired from the Iver Johnson carbine and bullets from the bodies of Leslie Clark and Edward Cody had been fired from the Inland Marine weapon. Six bullet jacket fragments and one bullet fired from the Inland Marine weapon were also found at the Purolator garage, as well as two such fragments fired from the Iver Johnson carbine. These bullets and fragments were bloody.

"On April 12, 1979, the Inland Marine M-1 carbine had been purchased under a fictitious name from the

North Haven Gun Company by Donna Couture as a gift for her husband, the [petitioner]. On April 13, Pelletier and [the petitioner] were seen going into the woods near Wallingford and a great number of shots were heard in those woods. A bullet and seven expended cartridge cases recovered from the woods were found to have been fired from the Iver Johnson and one such expended cartridge case was found to have been ejected from the Inland Marine M-1 carbine.

"A pair of Hit 800 bolt cutters was also found in the [petitioner]'s gun locker. These cutters had been used to cut a Page metal fence surrounding the Purolator garage to allow entry into the area. These same cutters had previously been borrowed from a Waterbury neighbor of Lawrence Pelletier by Pelletier's son. Found in [the petitioner]'s basement gun locker were also two ski masks with the eye openings narrowed by thread which Pelletier's girlfriend, Evelyn Vega, had prepared for the robbery, as well as trousers recognized as Pelletier's. In [the petitioner]'s gun locker the police also found an attache case, of the same type as the one found in Pelletier's house, filled with money. A footlocker was also found in [the petitioner]'s basement together with store boxes for the two attache cases. All three pieces of luggage had been purchased by Pelletier and Vega on April 16." *Couture I*, supra, 194 Conn. 532–34.

The petitioner filed this habeas petition on January 2, 2009. In October, 2013, the habeas court conducted a trial on the petitioner's third amended petition. In addition to raising claims of ineffective assistance of trial and appellate counsel, the petitioner also raised claims involving his speedy trial rights, double jeopardy, and sentence review. In a written memorandum of decision filed February 18, 2014, the habeas court, *Newson, J.*, restored the petitioner's right to sentence review, but denied the petition in all other respects. The habeas court granted certification to appeal, and this appeal followed.

Both claims raised by the petitioner in this appeal arise from the same underlying contention that the prosecutor in *Couture I* made improper statements during summation with the intent to subvert the petitioner's rights under the double jeopardy clause of the fifth amendment to the United States constitution and that such conduct should have barred his retrial. Accordingly, before we turn to the specific claims raised on appeal, we briefly set forth the relevant substantive law underlying the petitioner's double jeopardy argument.

"The basic contours of double jeopardy jurisprudence are well established. The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . This constitutional provision is applicable to the states through the due process clause of the fourteenth

amendment. . . . The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy. . . .

"The [d]ouble [j]eopardy [c]lause of the [f]ifth [a]mendment protects a criminal defendant from repeated prosecutions for the same offense. . . . As a part of this protection against multiple prosecutions, the [d]ouble [j]eopardy [c]lause affords a criminal defendant a valued right to have his trial completed by a particular tribunal. . . . Ordinarily, the prohibition against double jeopardy does not apply [if] a defendant has requested that a mistrial be declared. . . . [United States Supreme Court] cases, however, have indicated that even [if] the defendant moves for a mistrial, there is a narrow exception to the rule that the [d]ouble [j]eopardy [c]lause is no bar to retrial. . . .

"In *Oregon* v. *Kennedy*, [456 U.S. 667, 676, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982)], the United States Supreme Court stated that [o]nly [if] the governmental conduct in question is intended to goad the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion. In so holding, the court acknowledged that its language in cases such as *United States* v. *Dinitz*, 424 U.S. 600, 611, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976), appeared to broaden the test from one of intent to provoke a motion for a mistrial to a more generalized standard of bad faith conduct or harassment on the part of the judge or prosecutor. . . . In *Oregon* v. *Kennedy*, [supra, 675–76], however, the court explicitly repudiated the harassment standard . . . as the law, [holding [p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial *absent intent on the part of the prosecutor to subvert the protections afforded by the* [d]*ouble jeopardy clause*]. Instead, the court concluded that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." (Citations omitted; emphasis altered; internal quotation marks omitted.) *State* v. *Butler*, 262 Conn. 167, 174–75, 810 A.2d 791 (2002).

"Whether the conduct by the prosecutor was intentional is not the relevant inquiry. Rather, the question to be asked is whether the prosecutor intended to provoke a mistrial. . . . The requirement of intent is critical, and easily misunderstood. The fact that the government blunders at trial and the blunder precipitates a successful motion for a mistrial does not bar a retrial. . . . Yet the blunder will almost always be intentional—the product of a deliberate action, not of a mere slip of the tongue. A prosecutor who in closing

argument comments improperly on the defendant's failure to have taken the stand, thus precipitating a mistrial or a reversal on appeal, is no doubt speaking deliberately, though his judgment may be fogged by the heat of combat. *But unless he is trying to abort the trial, his misconduct will not bar a retrial.* It doesn't even matter that he knows he is acting improperly, provided that his aim is to get a conviction. . . . *The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means.*" (Emphasis added; internal quotation marks omitted.) Id., 178. With the preceding principles in mind, we now turn to the petitioner's claims on appeal.

I

The petitioner first claims that the habeas court improperly concluded that he failed to demonstrate that his appellate counsel, Attorney John R. Williams, had provided ineffective assistance.[2] According to the petitioner, Williams acted deficiently by failing to raise a double jeopardy claim in *Couture III*. In particular, the petitioner, relying on *Oregon* v. *Kennedy*, supra, 456 U.S. 667, and its progeny, argues that the prosecutor's improper remarks during summation in *Couture I* were made with the intent to goad the defense into moving for a mistrial and, thus, to subvert the double jeopardy clause. The habeas court disposed of this claim in rather summary fashion, concluding that the petitioner had failed to demonstrate either that Williams' decision not to raise the double jeopardy claim on direct appeal was deficient performance or that, had he raised the claim, it would have been successful. We agree with the habeas court that the petitioner has failed to show that Williams' actions as appellate counsel fell outside the range of professionally competent assistance guaranteed under the sixth amendment and, thus, we reject the petitioner's claim.

"A criminal defendant's right to the effective assistance of counsel extends through the first appeal of right and is guaranteed by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution. . . . To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both

prongs are satisfied. . . . It is well settled that [a] reviewing court can find against a petitioner on *either* ground, whichever is easier." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Small* v. *Commissioner of Correction*, 286 Conn. 707, 712–13, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008).

"Although a habeas court's findings of fact are reviewed under the clearly erroneous standard of review . . . [w]hether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Ham* v. *Commissioner of Correction*, 301 Conn. 697, 706, 23 A.3d 682 (2011).

A

We first consider whether the habeas court improperly concluded that Williams' decision not to raise a double jeopardy claim on direct appeal in *Couture III* did not constitute deficient performance. The habeas court found that Williams had advocated zealously for his client throughout the underlying criminal proceedings, and that his decision not to pursue the petitioner's double jeopardy claim on appeal in *Couture III* was not unreasonable in light of the record and prevailing law. On the basis of our review of the underlying record, we agree.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . [T]he [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Internal quotation marks omitted.) *Llera* v. *Commissioner of Correction*, 156 Conn. App. 421, 429, 114 A.3d 178, cert. denied, 317 Conn. 907, 114 A.3d 1222 (2015). "Just as with a claim of ineffective assistance of trial counsel, success on a claim of ineffective assistance of appellate counsel requires the petitioner to establish [under the first prong of *Strickland*] that appellate counsel's representation fell below an objective standard of reasonableness considering all of the circumstances. . . . [Although] an appellate advocate must provide effective assistance, [he or she] is not under an obligation to raise every conceivable issue. A brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions. . . . Indeed, [e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focus-

ing on one central issue if possible, or at most on a few key issues. . . . Moreover, [a] habeas court will not, with the benefit of hindsight, second-guess the tactical decisions of appellate counsel." (Internal quotation marks omitted.) *Smith* v. *Commissioner of Correction*, 148 Conn. App. 517, 531, 85 A.3d 1199, cert. denied, 312 Conn. 901, 91 A.3d 908 (2014).

The petitioner has failed to demonstrate that Williams' decision not to raise the double jeopardy claim as an appellate issue in his criminal appeal was anything short of a tactical decision, one that fell squarely within an objective standard of reasonableness. The habeas court, in addressing whether Williams had provided ineffective assistance by failing to raise the petitioner's speedy trial claim on direct appeal, credited Williams' testimony at the habeas trial that, as a matter of strategy, he only raised on appeal those issues that he believed had a likelihood of success, intentionally leaving out weaker claims. As appellate courts in this state have often repeated, this is an appropriate and sound strategy. See, e.g., *State* v. *Pelletier*, 209 Conn. 564, 567, 552 A.2d 805 (1989) (noting "effect of adding weak arguments will be to dilute the force of the stronger ones" [internal quotation marks omitted]); *Saucier* v. *Commissioner of Correction*, 139 Conn. App. 644, 652–53, 57 A.3d 399 (2012) ("strategy of culling out weaker claims is sound, not deficient, practice"), cert. denied, 308 Conn. 907, 61 A.3d 530 (2013).

As suggested by the habeas court, Williams' decision that the double jeopardy claim was not among the strongest appellate issues was informed by the fact that similar double jeopardy claims already had been rejected by other courts. Williams argued a related double jeopardy claim in a motion to dismiss the indictment against the petitioner so as to prevent the first retrial in *Couture II*.[3] The trial court in *Couture II*, *Glass, J.*, denied the motion to dismiss.[4] In so ruling, the court expressly found that the state's case against the petitioner was a strong one, concluding that there was no incentive for the prosecutor to try to abort the trial. Williams himself provided unchallenged testimony before the habeas court that the state's case against the petitioner was very strong, noting the fact that the items stolen from the armored car shipment were found in the petitioner's home and that the petitioner was unable to provide any alternate explanation for their presence. More importantly, Judge Glass found that the prosecutor's intent in making improper remarks during summation in the first trial was not to provoke a mistrial but to ensure a conviction.[5]

As previously set forth, it is the specific intent behind the prosecutor's improper remarks that is dispositive of a double jeopardy claim under *Kennedy*, and the court found in the present case that the prosecutor had the intent to prevail by impermissible means, not to

cause a mistrial or a reversal on appeal. Those findings would have been fatal to a double jeopardy claim that was based on prosecutorial impropriety. See *State* v. *Butler*, supra, 262 Conn. 178. It is axiomatic that an appellate court cannot retry facts or pass on the credibility of witnesses, and that it will reverse a habeas court's factual findings only upon a showing that they are clearly erroneous. See *State* v. *Collic*, 55 Conn. App. 196, 203, 738 A.2d 1133 (1999). Therefore, if Williams had raised the petitioner's double jeopardy claim on appeal in *Couture III*, he would have faced the daunting burden of establishing that the requisite intent necessary to support a double jeopardy violation under *Kennedy* existed in the face of an express factual finding by Judge Glass that such intent was not present.[6]

Additionally, following the retrial and subsequent conviction of the petitioner's codefendant, Pelletier, Pelletier's public defender raised as one of twelve claims in Pelletier's direct appeal that Pelletier's second trial should have been barred by double jeopardy pursuant to *Kennedy*. Pelletier's appellate counsel relied upon the very same prosecutorial improprieties that the petitioner now claims should have barred his own retrial. See *State* v. *Pelletier*, supra, 209 Conn. 566. Our Supreme Court, after first generally admonishing counsel for raising a "torrent of claimed error"; id.; rejected the double jeopardy claim out of hand, without a discussion of the merits of the claim. A fair reading of the Supreme Court's opinion is that the double jeopardy claim was among the weakest of the arguments raised, warranting no discussion. That decision was published prior to the petitioner's retrial in *Couture III* and would have been available to Williams in deciding what issues to raise in the petitioner's direct appeal in *Couture III*.[7]

Given the unfavorable factual findings arising from the trial court's adjudication of the motion to dismiss in *Couture II*, coupled with the Supreme Court's unfavorable disposition of a nearly identical double jeopardy claim in the direct appeal by the petitioner's codefendant, we are unconvinced that Williams' decision to forgo raising the double jeopardy claim now championed by the petitioner was anything other than a sound tactical decision, and that Williams' performance fell well within the range of reasonable and professional conduct permitted under the sixth amendment.

## B

Having determined that the petitioner failed to satisfy the performance prong of the *Strickland* standard, which determination is dispositive of the petitioner's ineffective assistance claim, it is unnecessary for us to address the prejudice prong. *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 429, 589 A.2d 1214 (1991). We choose in the present case to note, however, that even if we were to assume that Williams' decision not to raise the double jeopardy claim on direct appeal was

professionally unreasonable, the petitioner's claim of ineffective assistance of counsel would nonetheless fail because the petitioner has not established that he was prejudiced by that decision. See *Knight* v. *Commissioner of Correction*, 68 Conn. App. 617, 621, 793 A.2d 1092 (2002) (addressing prejudice prong after concluding counsel's performance was not deficient).

To determine whether a petitioner raising a claim of ineffective assistance of appellate counsel can prevail under the second prong of *Strickland*, we "assess whether there is a reasonable probability that, if the issue were brought before us on direct appeal, the petitioner would have prevailed. . . . To ascertain whether the petitioner can demonstrate such a probability, we must consider the merits of the underlying claim." (Citation omitted.) *Small* v. *Commissioner of Correction*, supra, 286 Conn. 728. In our discussion of the performance prong of *Strickland* and why it was objectively reasonable for Williams to have chosen to omit the double jeopardy claim, we already have exposed the weakness of the petitioner's double jeopardy claim and thus its unlikelihood of success on appeal.

Whether the prosecutor had the necessary intent to cause a mistrial or a reversal on appeal is a factual determination. *State* v. *Butler*, supra, 262 Conn. 178. Thus, in order to prevail on his double jeopardy claim, the petitioner would have had to establish that the prosecutor committed improprieties with the intent to induce a mistrial. The petitioner argues that, in the present case, the prosecutor's improper intent reasonably can be inferred from the egregious nature of the improprieties that led to the reversal of his first conviction. That argument on its face seems to invoke the bad faith conduct or harassment standard that the Supreme Court expressly disavowed in *Oregon* v. *Kennedy*, supra, 456 U.S. 675–76. In any event, as we already have mentioned, the underlying criminal record is not silent on the issue of the prosecutor's intent. Rather, Judge Glass found that the prosecutor's intent in making the improper remarks during summation "was to persuade the jury to return guilty verdicts against the [petitioner and Pelletier] and not to provoke a mistrial by prodding, urging or goading defense counsel to engage in conduct beyond the conduct normally expected of defense counsel in response to vigorous advocacy." Faced with that finding, which is reviewable only for clear error, it is not reasonably probable that, had the double jeopardy claim been raised, the petitioner would have prevailed. Because the petitioner failed to satisfy his burden under *Strickland*, we conclude that the habeas court properly rejected the petitioner's claim of ineffective assistance of appellate counsel.

## II

Finally, the petitioner claims that the court improp-

erly rejected his freestanding claim of double jeopardy. The habeas court determined that the freestanding double jeopardy claim failed primarily for two reasons. First, it concluded that either the petitioner had waived his double jeopardy protection by appealing from his conviction in *Couture I*, or that the same jeopardy that attached at his first trial continued through the appeal and into his subsequent retrials. See *State* v. *Boyd*, 221 Conn. 685, 691–92, 607 A.2d 376 (noting that overlapping theories of waiver and continuing jeopardy underlie general rule that defendant cannot seek to set aside conviction and then rely on overturned conviction to bar new trial), cert. denied, 506 U.S. 923, 113 S. Ct. 344, 121 L. Ed. 2d 259 (1992). Second, the habeas court concluded that it was barred from adjudicating the double jeopardy claim by the doctrine of res judicata. Because we conclude, for the reasons we will set forth, that the habeas court properly declined to review the petitioner's claim on res judicata grounds, we do not consider the habeas court's alternate basis for rejecting the petitioner's claim or the sole argument on appeal by the respondent, the Commissioner of Correction, that the petitioner's freestanding claim of double jeopardy was not a cognizable claim because the petitioner failed to demonstrate cause and prejudice to overcome his procedural default for not raising the claim on appeal in *Couture III*.[8]

"The applicability of the doctrines of collateral estoppel or res judicata presents a question of law that we review de novo." *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 601, 922 A.2d 1073 (2007). "The doctrine [of res judicata] . . . applies to criminal as well as civil proceedings and to state habeas corpus proceedings. . . . However, [u]nique policy considerations must be taken into account in applying the doctrine of res judicata to a constitutional claim raised by a habeas petitioner. . . . Specifically, in the habeas context, in the interest of ensuring that no one is deprived of liberty in violation of his or her constitutional rights . . . the application of the doctrine of res judicata . . . [is limited] to claims that actually have been raised and litigated in an earlier proceeding." (Internal quotation marks omitted.) *Pierce* v. *Commissioner of Correction*, 158 Conn. App. 288, 307, 118 A.3d 640, cert. denied, 318 Conn. 907,      A.3d     (2015).

"The doctrine of res judicata holds that an existing final judgment rendered upon the merits without fraud or collusion, by a court of competent jurisdiction, is conclusive of causes of action *and of facts or issues thereby litigated* as to the parties and their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction. . . . If the same cause of action is again sued on, the judgment is a bar with respect to any claims relating to the cause of action which were actually made or which might have been made. . . . Claim preclusion (res judicata) and issue

preclusion (collateral estoppel) have been described as related ideas on a continuum. . . . More specifically, collateral estoppel, or issue preclusion . . . prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim. . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." (Citations omitted; emphasis added; internal quotation marks omitted.) *Powell* v. *Infinity Ins. Co.*, supra, 282 Conn. 600–601.

As we have indicated several times previously in this opinion, the issue of whether the improprieties committed by the prosecutor during the petitioner's first trial implicated the petitioner's double jeopardy rights and should have barred a retrial was raised previously and litigated fully by way of the motion to dismiss that was filed prior to the petitioner's second trial. It is undisputed that the criminal court was a court of competent jurisdiction. The dispositive issue before the criminal court, an issue it necessarily determined in resolving the motion to dismiss, was whether the prosecutor's improper remarks were made with the intent to goad the petitioner into seeking a mistrial in order to subvert the petitioner's double jeopardy rights. That is precisely the same factual and legal issue that the habeas court would have had to consider to adjudicate the merits of the petitioner's freestanding double jeopardy claim.

In the criminal action, Judge Glass rendered a judgment on the merits denying the motion to dismiss and in doing so expressly found that the prosecutor lacked the requisite intent to goad the defendant into seeking and obtaining a mistrial. That decision became "an existing final judgment, rendered upon the merits without fraud or collusion, by a court of competent jurisdiction"; (internal quotation marks omitted) *Powell* v. *Infinity Ins. Co.*, supra, 282 Conn. 600; upon the petitioner's failure to raise the double jeopardy issue in his appeal following his conviction in the third trial. On the basis of our review, we conclude that the habeas court properly determined that it was barred under the doctrine of res judicata from relitigating Judge Glass' factual determinations in *Couture II* and, thus, ultimately, from considering the merits of the petitioner's freestanding double jeopardy claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The habeas court granted certification to appeal from the judgment.

[2] Attorney Williams acted as both the petitioner's trial and appellate counsel throughout the underlying criminal proceedings, beginning with *Couture I*.

[3] The double jeopardy argument advanced by Williams in the motion to dismiss was not that the prosecutor intended to produce a mistrial, but that the prosecutor had sought to goad defense counsel into making repeated

objections to the prosecutor's improper statements, thereby making him appear to the jury as an obstructionist and creating disfavor as to the petitioner and his codefendant.

[4] The court's memorandum of decision was offered and accepted as a full exhibit before the habeas court.

[5] In his decision, Judge Glass found that "[n]otwithstanding the observation of our Supreme Court that the prosecutor's prepared remarks were deliberate, facially improper, persistent and pronounced . . . there is nothing in the evidence cited in the *Couture* or *Pelletier* opinions or the transcript of the prosecutor's summation to show that the prosecutor believed that he had *anything other than a strong case* against the [petitioner and Pelletier], and logic, trial strategy and economy of trials under these circumstances, would seem to dictate avoiding aborting the trial and not intentionally engaging in prosecutorial conduct necessitating a mistrial at the behest of the prosecutor or at the request of the [petitioner and Pelletier]. . . . After reviewing the transcript of the prosecutor's summation, the court is persuaded that his intent and objective in making the [improper] remarks was *to persuade the jury to return guilty verdicts* against the [petitioner and Pelletier] and *not to provoke a mistrial* by prodding, urging or goading defense counsel to engage in conduct beyond the conduct normally expect of defense counsel in response to vigorous advocacy. Also, the court is persuaded that the prosecutor by his summation did not intend to goad defense counsel into engaging in conduct that would cause the jury to view the [petitioner and Pelletier] any more unfavorably than the evidence and reasonable inferences therefrom would justify." (Citations omitted; emphasis added.)

[6] We note that Williams filed an interlocutory appeal from the denial of the motion to dismiss and that our Supreme Court dismissed that appeal. According to the undisputed evidence before the habeas court, the appeal was dismissed for lack of a final judgment. Although generally the denial of a motion to dismiss is not an appealable final judgment, our Supreme Court has long recognized an exception to that general rule if the motion raised at least a colorable claim of double jeopardy. *State* v. *Moeller*, 178 Conn. 67, 420 A.2d 1153, cert. denied, 444 U.S. 950, 100 S. Ct. 423, 62 L. Ed. 2d 320 (1979); see also *State* v. *Crawford*, 257 Conn. 769, 775–76, 778 A.2d 947 (2001) (noting that "[w]e have entertained several interlocutory appeals from denials of motions to dismiss based on double jeopardy claims," and "[t]he only real question is whether the double jeopardy claim is colorable" [internal quotation marks omitted]), cert. denied, 534 U.S. 1138, 122 S. Ct. 1086, 151 L. Ed. 2d 985 (2002). Although our Supreme Court's order dismissing the petitioner's interlocutory appeal contains no discussion of the merits of the appeal, it would not have been unreasonable for Williams to have viewed the dismissal as an additional indication that the petitioner's double jeopardy claim was not a particularly strong one.

[7] Although there is no specific indication in the record before the habeas court that Williams specifically relied upon the *Pelletier* decision in making his decision not to raise a double jeopardy claim in the petitioner's appeal, it is clear from his testimony overall that he was aware of Pelletier's retrial, and the petitioner has presented no evidence suggesting that Williams was unaware of the Supreme Court's decision.

[8] The respondent properly raised the defense of procedural default in his return responding to the petitioner's third amended petition for a writ of habeas corpus. Although procedural default is a threshold issue, the habeas court did not address it in its memorandum of decision. See *Taylor* v. *Commissioner of Correction*, 284 Conn. 433, 447–48 n.18, 936 A.2d 611 (2007) (emphasizing that "habeas court generally should decide the threshold issue of cause and prejudice when it is raised as a defense because, in the ordinary case, failing to do so undermines the prudential considerations that the cause and prejudice rule was designed to promote"). Because a finding that the petitioner had procedurally defaulted on his double jeopardy claim would have precluded any further consideration by the habeas court of the petitioner's claim, we presume that the habeas court implicitly decided the procedural default issue in favor of the petitioner, especially in light of the respondent's failure to demonstrate otherwise by seeking an articulation by the habeas court on the issue of procedural default. See *Orcutt* v. *Commissioner of Correction*, 284 Conn. 724, 737–38, 937 A.2d 656 (2007).